The third case today is, I hope I pronounce this correctly, Mischek v. State Farm Mutual, 18-1156. Counsel, please proceed. Thank you, Your Honor. May it please the Court, I'm Bradley Levine. I'm counsel for Skya Christensen with respect to this appeal. With me is Michael Rosenberg. He represents Patricia Mischek. I'm going to be handling the argument on behalf of both parties for purposes of today. The insurance policy, which was issued by State Farm, provides as follows. It says that if you have a UM-UIM claim that we, the insurance company, will pay compensatory damages for bodily injury an insured is legally motorist. The policy says that the insured and we, the State Farm, must agree to the answers to two questions. One is the question of legal entitlement, and the second question is, assuming that there is legal entitlement, what are the compensatory damages that you are entitled to from the tortfeasor who is either uninsured or underinsured? That's what, again, the State Farm vowed itself to do. In the vast majority of cases, what happens is that someone makes a UM-UIM claim, the insurer does, and there is a discussion, a negotiation that takes place, whether or not you are represented by counsel. Vast, vast majority of cases, that's the situation. It's the very, very rare instance, as in what happened in the Calderon case, which is that there isn't an agreement reached, there's litigation ensues, case goes all the way to trial, and you have a determination by a jury in that case as to what the amount of those compensatory damages are. It's up to the insurance company to negotiate in good faith and to reach an agreement. That's what they said. That's what they bound themselves to do. Now, what we have here is that in the course of that discussion, negotiation, because, of course, both these claimants were represented by counsel. During the course of that negotiation, the insurance company, State Farm, said, we are deducting $5,000 because we paid you under your MedPay, a separate coverage, we paid you the $5,000, and we're deducting that from the amount that we're going to pay you under your UM-UIM coverage. Now, the problem is that at the time that that was done, in 2014 and 2015, or excuse me, 2015 and 2016, when the deductions were actually taken, at that time, we had a statute in Colorado, 10-4-6-0-9-1-C, that addressed this issue and said that the insurance company shall not, and those are the words that are in the statute. It says the company shall not reduce, by way of an offset, the amounts that are being paid under the MedPay coverage. So did you bring that up to State Farm during the negotiation period? Because you had negotiations, right? Well, I didn't personally handle the negotiations. Your client was represented, wasn't she? Was represented, yes, by the Azar firm. And they had negotiations, didn't they? Sure. They got themselves in these negotiations and these discussions. That's absolutely right. Did they notify State Farm, hey, what you're proposing here is violating this Colorado statute? There was absolutely no correspondence that says that. Okay. And at some point, there was a decision made by your client that she didn't want to futz around with more negotiations and she got a check, right? Well, I really appreciate it. You're right. That's exactly what happened. That there weren't going to be any further discussions. There was an agreement that was reached pursuant to the terms of the policy at $16,000 with respect to Ms. Christensen. Okay. And so what, I mean, did everybody understand when State Farm tendered the check and she deposited it that that was it? That was for everything? Or did she think, you know, I'm keeping a claim alive against these people? Great question. And the answer is that if you look at just simply the correspondence, all that the company said was, here's $16,000 to, quote, settle the claim. That's the term that was used there. But there, as the record, we had no release whatsoever. There wasn't any indication that this was full and final, that you couldn't bring up any other further claims. Okay. So that's a little bit different than the other plaintiffs. Yeah, the mischeck's a little bit different in the sense that the company said in its final correspondence, we are not, we don't require a release, but that this is, and they used the term in the correspondence, full and final. That was unilaterally, they said that, they used that terminology. And wasn't there something on a check stub to? It was a check stub that said, used the term, again, this was a check stub that said, full and final. Okay. And shouldn't that have put your client and the other plaintiff on notice that that was it, that's all they were getting? Well, Your Honor, when you say that, quote, unquote, put you on notice, and that really is where we're going to sort of get into the heart of what this is all about, which is that what you have is you have this payment that's being made. You don't have any kind of release that's being tendered. The point there is, is that what you've got is you've got this offset that is taken in violation of the law. That's what, you know, and again, because that's, of course, the other point of the conversation, which is that at the time that this was being resolved, that the resolution was being reached, at that time we had 10-4609. We didn't have the Calderon decision. But the point is, is that that was the law, and we're assuming for purposes, and of course that's the other conversation as to whether or not the decision Calderon is retroactive or not, okay? But for purposes of the discussion as to the impact, we have to assume that they were doing something, they were taking an offset that they were disallowed from doing under 10-4609. Now, the point is, when you say that's all you're getting, okay, you can say that. You can say, well, except for the fact that it potentially leaves open if you've got further injuries, other things that happen, you know, there was no indication, Ms. Christensen, that you wouldn't be able to make a further claim just as happened in the Peden v. State Farm case, okay? Well, let me ask you a question. So you're a prudent attorney. If your client received a check that said full and final on it and it was accompanied by a letter that said, look, I'm not going to make you sign a release, but we're tendering this with the understanding that this is all you're getting. You're getting nothing else. And your client called and said, hey, I want to deposit this. Sure. And you thought you had an additional claim because ultimately your claim is not going to be just for five grand. It's going to be for bad faith probably and some things that might come up. Are you going to tell your client, yeah, go ahead, deposit it, don't worry about it? Oh, no, no, no, no, no. Your Honor, look, I mean, the understanding is you're going to have a conversation with the client about whether or not you take the money and or whether or not you're not going to take the money in over a $5,000 amount, and as you say, maybe there's bad faith, maybe there's not, whether or not we're going to go ahead and we're going to litigate the rest of this case. And you might have that discussion, as you say, with your client. But the upshot of it is that the mere fact that you took that money doesn't mean under these circumstances that you can essentially waive, if you will, if we're going to use that term, the fact that they've taken an illegal offset. They've done something in violation of the law. And what State Farm would want us to... When you reference the illegal offset, let me be clear on that. Yes. The statute is what the statute is, but prior to Calderon, was it clear that that was illegal? Well, when you say, from my perspective, what the Supreme Court of Colorado said... The Supreme Court of Colorado ruled that you couldn't do the offset, right? The Supreme Court of Colorado said that you cannot, that you do, we said that the offset was impermissible. And it did this after the negotiations in this case, right? It was decided afterwards, and that's why the question of whether or not it's going to apply, and that's why we need to look at the... Yeah, but you're not talking about retroactivity when you've made these statements about what they were doing being illegal. That's a little disingenuous, isn't it? Your Honor, I don't think it is. You haven't clarified that it's only illegal if we accept the fact that Calderon is retroactive. And I want to make that very clear. You didn't make that clear. And I thought that I had. I apologize, Your Honor, which is that that's why it is illegal if, in fact, you find that the law at that time was as what the Calderon court said it was, and it applies on a retroactive basis. And I do want to make that absolutely clear, and that's why that is an important distinction here. But what State Farm has said here is that they are trying to sort of narrow, if you will, the scope of the decision in Calderon. And what they're saying here is that Calderon, because of the fact, in that case, again, a very rare circumstance that you go all the way through a trial, that you have a determination, a determination by a jury as to what those compensatory damages amount are, that that's all that Calderon involves. And that, instead, because what happened here is we had this negotiation, which occurs in, like I say, the huge vast majority of cases, that Calderon is not going to apply. Now, what do we do with McCracken? I'm sorry, what? What do we do with McCracken? Well, as far as McCracken, the panel in McCracken relied on, if you look at that opinion, they relied principally, I think that was the term that the panel used, on the court of appeals opinion in airline. And the answer is, Your Honor, is that what we had asked for, and we continue to implore the court, that even though we're having this argument today, that the court abate any kind of final determination in this case, until we've got a cert petition that's pending in the airline case, that the cert petition was filed at the beginning of August of this year, that you wait until we see whether or not the Supreme Court is going to review airline. I thought McCracken explicitly went beyond airline. It said, let's look and see whether there are other data points to evaluate this question. Is that not right? I think that for the most part, you know, yeah, they did just rely only on airline. But, Your Honor, I believe that at the end of the day, that the court of appeals quoted liberally and said we were making, I think they used the term principal reliance, on what the court of appeals said in the airline case. And they said that, you know, we can look at that if we think that that's a good predictor of what the Supreme Court's going to do. But I think it is, I think what this panel should do is wait until we see, because we will find out, I think probably within the next month or two, whether or not the Supreme Court is going to accept the airline case. And that's going to be very important. It's going to have a lot of impact if, in fact, they do accept it, because... And so the Supreme Court accepts it, and then we say, all right, well, we're going to continue to abate until the Supreme Court makes its decision. Absolutely. I don't think that makes any sense. Well, that's what another panel of this court has done in Zavallo's case. I mean, they haven't said they're going to. What they've asked us to do in Zavallo's is to keep them apprised. They're abating until... It's a big difference in saying that's what they're going to do. Isn't it? Sorry? It's a big difference in saying that's what they're going to do. Well, no, you're right. I don't know what they'll do. We are supposed to let them know within five days after the Supreme Court has ruled on the cert petition whether or not they're going to, you know, what they're going to do. I would hope that if the Supreme Court accepts cert, because I think this panel needs to hear what the highest court has to say, because, again, that whole distinction that we're talking about, the question of whether or not we're talking about, you know, merely where there's been some kind of ultimate decision by a jury as opposed to negotiation, that's going to be decided in the airline case if the Supreme Court accepts the case. And I think that that is going to be seminal in terms of this court's determination. Now, the other thing is, of course, in airline we had a release. We don't have that here. This notion of accord and satisfaction, and the bottom line is that there is no... The elements for an accord and satisfaction aren't met here because we don't have an accord. And the reason is because, as I talked about, the promise under this agreement is that we're going to agree. There's not a substituted performance which is required under Colorado law for you to have an accord. So what if there was a release? Would you... We wouldn't have a case here? Oh, no, absolutely we'd have a case. We'd hopefully be, like I say, again, just like the court did, because in Zavallos is a good example of where there was a release. I would hope that we would wait and see what the Supreme Court of Colorado, the highest court, has to say about it. But, again, the release tells you something different because, again, you can't have a release which is in violation of the law of public policy in the state of Colorado. And so that's the argument. Well, I mean, in this case, at the time it happened, it would have been over something that was disputed because the Colorado case had not been decided yet. So if you had a release in this case, it wouldn't be the same as if you entered into a release today that violated the law of policy of Colorado. And that, by the way, that's a very good point, because State Farm has acknowledged that since the Calderon decision that, oh, no, no, no, we have changed our procedures now and we don't take offsets and we've instructed our people not to take offsets. We're putting endorsements on our policies with respect to non-duplication provisions. The upshot is that if that's the case, again, it gets back to Judge Holmes, the point about if the decision applies retroactively, okay, in other words, that that's something that should have happened, they should have been doing that for the eight years between 2008 and 2018. In other words, it's an acknowledgment on their part that this should apply. In other words, that the Colorado should apply with respect to them. It's a remedial measure, isn't it? You wouldn't be able to introduce that, would you? No. What it goes to, Your Honor, is that it's an acknowledgment that it should apply in the context of a negotiation. In other words, it's not just simply they are changing things so that now when you negotiate with State Farm, they're not taking the offset. And the upshot of that is that, you know, Oh, it's not retroactive. It's only going to be on a prospective basis, which in our minds is in derogation of Colorado law and certainly this intense search decision in the Clark case. Thank you, my time is up. Thank you very much, Counsel. May it please the Court. Good morning, Your Honors. Good morning. My name is Frank Falzetta, and along with my co-counsel, Andrew Lavin, I represent the defendant in that plea, in this case, State Farm. The district court below properly granted State Farm's motion for summary judgment on the defenses of settlement and accordance satisfaction. On de novo review, we respectfully request that this Court affirm that ruling. The undisputed facts below showed that both Ms. Mischeck and Ms. Christensen, through their attorneys, voluntarily settled their disputed UIM claims with State Farm for a compromised amount of money that they agreed to after negotiations back and forth between the parties. Importantly, they did so with full knowledge of two things. One, that State Farm's settlement evaluation range for their UIM claim included a $5,000 MedPay offset for benefits they previously received because at that time, the insurers and the law at that time seemed to enforce those kinds of MedPay offset provisions and policies. And secondly, they knew that the propriety of that MedPay offset was a hotly contested issue that was wending its way to the Colorado Supreme Court. In fact, the Azar firm that represented Ms. Christensen was the lead firm in Calderon. So they, of course, knew it, and they had already lost the Calderon case at the appellate court level when we settled our case, so they knew it was an issue. They nonetheless accepted State Farm's settlement payments without ever reserving the right to seek additional UIM benefits based upon the ultimate decision in Calderon. Well, appellants now make three arguments in an effort to undo those settlements. First, they argue that according to satisfaction, that doctrine is inapplicable here. Second, they say that there could be no settlement without a written release. And third, they say that the settlements violate Colorado public policy as expressed in Calderon and are therefore unenforceable. I'm going to take the third first because, Judge Holmes, I think your question about what do we do with McCracken is really on point. McCracken and our line before it and every other court to have considered the public policy issue, the public policy idea that they've raised here, that Calderon somehow expressed in public policy that made these pre-Calderon settlements of UIM claims unenforceable, every court has rejected it. This court, via another panel, rejected it in McCracken. And they did so not only relying on our line but also looking at what they predict the Supreme Court might do that might be different than our line. They rejected it on several grounds, not just because our line said so. They looked at it independently. And by the way, as this court knows because Judge Holmes and Judge McKay have authored opinions that say just because one other panel of the district said it doesn't mean it isn't stare decisis in this court, it is. And what the McCracken panel said was that there was no public policy that outweighed the public policy of Colorado in favor of enforcing settlements. There was nothing in the settlements that suggested there was an undisputed amount that we agreed that was owed because that's what the insured would be legally entitled to collect from the uninsured driver, that we then, after the fact, agreed to a number and then deducted the MedPay offset. That's not what happened. In our case, like in McCracken and like in our line and like in every other case, the carrier took into account the MedPay offset when setting the evaluation range and making its offers. But thereafter, it was a freewheeling negotiation between the parties. And all the parties did was come to an agreement about a sum certain that State Farm would pay in settlement of the claim. And I beg to differ with Mr. Levine about the nature of the correspondence that went around those negotiations and went around those settlement payments. If you look at the mischeck case, it couldn't be clearer. In fact, in the mischeck case, the Bonkus and Schenker firm represented Ms. Mischeck. They began the settlement negotiations with a letter that demanded the full UIM policy limits of $100,000. And what they said in the letter is we want the $100,000 for a, and I'm quoting, full and final settlement of all claims which he may have arising out of the auto accident. The parties then began their negotiations and State Farm went back and forth making offers. And every time they made an offer to Ms. Mischeck, they documented it in a letter. And the letters always said, here's our offer, our settlement offer, to bring this claim to a conclusion. And at the end of the letter it said, and the settlement offers are inclusive of all damages, known or unknown, and any liens, assignments, or other statutory rights of recovery. No one could mistake that for anything other than what it was. What did we do with this somewhat unusual language in Mischeck? There is no release requested with this payment. When you decided to pay her, what was the import of that language? The import is simply that we didn't require, like some of the other carriers did in McCracken and Arline, we didn't require a formal written release that had to be signed by all parties. We simply documented the fact of the settlement in the correspondence back and forth between us and the claimant or claimant's counsel. And that's perfectly legitimate in Colorado. In Colorado, you don't even need a writing. Well, I'm not suggesting it was illegitimate. I'm just suggesting whether it has any impact on the knowledge of Ms. Mischeck that this was a final payment. And that's what I'm getting to because I wanted to read the final settlement letter that accompanied the check, the $70,000 check to Ms. Mischeck. That settlement check, by the way, on the stub said, quote, full and final UIM settlement. Then the accompanying cover letter explained that there was no release requested in exchange for the payment. However, this will confirm our agreement settles any and all claims under the uninsured motorist coverage with State Farm arising out of the accident. In other words, we didn't require a formal release because we didn't need to. We could document the settlement in the correspondence, and we did, and that was part of State Farm's claim procedure. But we made it clear in the final letter in closing the check that said full and final satisfaction that it was just that. And when that was happening, she was represented by counsel, correct? She was represented by counsel, and they knew full well about the Calderon case winding its way up to the Supreme Court, and they knew full well, in fact, they knew that we were taking the offset as part of the initial offer. And remind me on this letter, did the letter go directly to Ms. Mischeck, or did it go to her counsel? It went to her counsel, and we did request for admissions during discovery that said admit that counsel was authorized to negotiate the settlement on behalf of the appellants, and they said admit. So there's no question about authority to negotiate the settlement, and we did it with skilled lawyers who practice in the area and who knew about Calderon and the offset issue. They nonetheless accepted the money. Ms. Mischeck cashed the settlement check with no protests or reservations whatsoever. Ms. Christensen, a little different, but nonetheless the settlement offer letters were the same. They always said this is in settlement of your claim to bring it to a close, and then the final letter enclosing the $16,000 that we ultimately agreed to pay, Ms. Christensen said, we have agreed to settle your client's uninsured motorist claim for $16,000 inclusive of all liens. Now remember, Ms. Christensen is represented by the A's, our firm that litigated the Calderon case. They know all about it. If they wanted to accept out a claim for some ultimate conclusion in the Calderon case about the viability of MedPay offsets, they had the knowledge and ability to do that. And this is important because the other argument that Mr. Levine is making about accord and satisfaction not applying here because there's no substitute performance, Judge Rimmer rejected that, and rightly so, because the performance under the UIN provision of the policy isn't simply that the parties need to agree about the compensatory damages that the claimant is legally entitled to collect from the torque feeser that's underinsured. It's different than that. It says we either have to agree on the amount of those compensatory damages or we litigate it. And when we couldn't agree, remember, we were disputing with them all along what those compensatory damages were because a large element of them was general damages, which are subjective by nature and subject to dispute. So there was a big range of settlement negotiation authority because of that subjectivity. And so we could never agree with them about what the exact amount was that they were legally entitled to collect from the torque feeser. So rather than litigate, which was alternative two under our policy provision, you either agree with us or you litigate. Rather than litigate, all the parties just said we'll pay you some certain in settlement and we'll be done. That's what happened. No more futzing around in Judge Carson's terms. That's exactly what happened. It's a term of art. It is a term of art. And that's what McCracken picked up on in rejecting the public policy argument. McCracken said this isn't like the Kroll case. They rely on the Kroll case for the proposition that this settlement agreement violates public policy and, therefore, it's unenforceable. But what McCracken said about Kroll is that Kroll isn't the same because, in Kroll, there was a bilateral agreement between the insurance carrier and the claimant about the value of the UIM claim. They agreed it was $30,000, the UIM limit, in Kroll. And then the carrier worked in a subrogation provision under the release trust agreement that said, but if you collect any money from anyone else, we get 15% of it. And they thereby reduced the bilaterally agreed upon undisputed amount of compensatory damages owed by a sum equal to 15% of the recovery. That was the evil in Kroll that led the Supreme Court to say it violated public policy. And McCracken says that isn't true of any of these other cases, including ours here today, because there was no bilateral agreement as to what those compensatory damages that they were legally entitled to collect from the tort fees would be. There was instead a settlement amount. If you'll take X, we'll all go away. And that was critical to McCracken in distinguishing Kroll, because McCracken had no problem with the offset being taken as part of settlement negotiations. And then coming to some sum certain, so long as that sum certain wasn't then further reduced by the MedPay offset, and it wasn't here, it wasn't in McCracken, it wasn't in R-Line, it was not in Zavallos, I can go on and on and on about all the cases that they filed post-Calderon where every single court has said the same thing. In that circumstance, there's no violation of public policy, there's no violation of Calderon. So to that point, just like McCracken, I mean, there's no need, there really would be no need if we adopt that view to decide on the retroactivity of Calderon anyway. Exactly right, and that's what McCracken said in the footnote, because by even having this discussion about public policy, we're sort of assuming retroactivity, which we don't agree with, but it's sort of beside the point. Because if you agree with us that there was a settlement or a court in satisfaction that bars any further UIM claim for that offset, then you don't need to reach the issue. That's what McCracken said in, I believe, footnote three. And interestingly, it's also what the companion to R-Line, the appellate court case that went up, there was a second appellate court case that went up after R-Line. And excuse me, Your Honors, I can grab it. Whitmore? The Whitmore case, it was unpublished, R-Line was published. Which? Whitmore. Whitmore. And Pacheco versus Metropolitan Casualty Insurance Company, same panel that decided R-Line. And R-Line didn't have to address it, because they said you first raised retroactivity during oral argument, we're not going to address it. But Whitmore, they did brief it, and they did argue it. And Whitmore said the same thing that McCracken said. Because we're finding a settlement agreement that's enforceable and not in violation of public policy, we don't have to think about retroactivity, because we've already considered the implications of Calderon in deciding that it doesn't violate public policy. So that's correct. You can sidestep the whole issue if you determine, as we believe, that there's no violation of public policy. So in sum, this case. Before you do that, do you have a case where the parties, where a court upheld a court in satisfaction based on a check stub alone that said it was for full and final settlement? Check stub alone, no, but we cite the R.A. Reether case, and we think we're on all fours with that. And R.A. Reether had just a little bit of correspondence, and I believe accompanying the check it said this is in full and final payment. And in Reether, interestingly, Judge Carson, in the Reether case, the Colorado Court of Appeals said, even though the plaintiff put on the check protests, we think more is owed. Colorado is one of those jurisdictions that doesn't follow the UCC about that and says, we don't care about that. If you cash the check, you've accepted the accord, it's now satisfied, you're done. So the Reether case was, and by the way, that was merely a dispute about the amount owed under the contract in R.A. Reether. There was a contract price, and the customer believed that the contractor did something wrong, so they didn't want to pay him the full price, and there was a back and forth negotiation about it. And then the customer offered a discounted amount to the contractor. The contractor still said, I think I'm owed more, but I'm cashing your check. And the Colorado Court of Appeals had no problem saying, accord and satisfaction, enforceable, you're done. And that is the law. And by the way, everyone's hung up on accord and satisfaction. We raise both settlement and accord and satisfaction. It's either one. It's both. Because we not only have a settlement reflected in the correspondence accompanying the settlement check, but we also have a substituted performance in the way of a compromised amount we're going to pay to resolve the UAM benefits, rather than agree about the compensatory damages or litigate. Thank you for your time, Your Honors. Unless you have any further questions, I'll sit down. Thank you, Counsel. Did you have any remaining time? He did not. I did not. Case is submitted then, and we'll take a ten-minute break, and we'll be back.